IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| CATRECE Y. MOSLEY, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Case No. 3:12-cv-00925-PMF |
| | ) |
| CITY OF EAST ST. LOUIS and | ) |
| JULIUS YOUNG, | ) |
| | ) |
| | ) |
| Defendants. | ) |

## MEMORANDUM AND ORDER

**FRAZIER, Magistrate Judge:**

Before the Court is the Motion for Summary Judgment filed by defendants City of East St. Louis (the "City") and Julius Young (Doc. 51). Plaintiff Catrece Mosley filed a response in opposition (Doc. 58). Mosley is a former employee of the City jail and Julius Young was her supervisor at the facility. In her complaint Mosley states that she was subject to sexual harassment and retaliation while working at the jail. Mosley proceeds on a three count third amended complaint (Doc. 41). Mosley asserts a hostile work environment sexual harassment claim (Count I) and a Title VII retaliation claim (Count III) against the City. Mosley also asserts an intentional infliction of emotional distress claim (Count II) against Julius Young and the City. For the following reasons, the defendants' Motion for Summary Judgment is GRANTED as to Mosley's intentional infliction of emotional distress claim (Count II). The Motion for Summary Judgment is DENIED as to Mosley's hostile work environment sexual harassment (Count I) and retaliation (Count III) claims.

1

I.   BACKGROUND

Rule 56 of the Federal Rules of Civil Procedure provides that "the court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." When presented with a motion for summary judgment the Court must "construe all facts and reasonable inferences from the record in a light most favorable to the nonmoving party." *Magin v. Monsanto Co.*, 420 F.3d 679, 686 (7th Cir. 2005). With that standard in mind, we turn to the facts of this case. Plaintiff Catrece Mosley began working for the City in December of 2007. (Mosley Deposition, Doc. 58-18, p. 7). She was employed as a jailer and occasionally worked as an evidence technician for the City. *Id.* The jail and evidence room are both located in the basement of the City hall. *Id.* Mosley continued to work as a jailer until her employment was terminated in May 2013. Seven individuals typically worked in the jail; defendant Julius Young (the jail supervisor) and six other jailers (including plaintiff). (Young Deposition, Doc. 58-16, p. 6). Except for one several month period, Mosley was the only female jailer during her employment at the jail. (Doc. 58-16, p. 11). Defendant Julius Young was Mosley's supervisor during her entire term of employment at the jail. (Doc. 58-18, p. 7).

When she started working for the City Mosley immediately became uncomfortable with some items she observed around the workplace. (Mosley Deposition, Doc. 58-18, p. 9). In one of the desk drawers there were several pornographic magazines along with pages from a pornographic book. *Id.* The materials showed nude photos and individuals engaged in sex acts. *Id.* In addition to the materials in the desk, Young decorated the office with two sexually suggestive items; a "Playboy" calendar and a painting of musician Alicia Keys "posed half-

naked on a rug." *Id.* A month or so after Mosley started working for the City she asked Young to remove the offending items. *Id.* He declined to do so. *Id.*

Mosley acknowledged at her deposition that the City implemented an employee discrimination and harassment policy. Pursuant to the policy, "[a]ll employees are required to immediately report any harassment or retaliation issues or suspected violations of this policy." (Doc. 58-18, p. 8). Reports of harassment, retaliation or discrimination were to be submitted orally or in writing to the City manager or to the Director of the Office of Employee Services. (Doc. 58-18, p. 13).

After Young did not remove the offending items, Mosley wrote a report complaining of the items to Lieutenant Alicia Bruce in March of 2008. Alicia Bruce was the Commander of Support Services. After filing the report, the work relationship between Mosley and Young grew increasingly hostile. Young repeatedly called Mosley a "bitch" and threatened to have her fired. He also assigned her to additional tasks that were not initially her responsibility, such as monitoring the phone at the Sergeant's Desk.

In August of 2008 Mosley complained of Young's conduct to both Lieutenant Childress and Chief Baxton. Lieutenant Childress replaced Lieutenant Bruce and Baxton was the Chief of the East St. Louis police department. Young was present in the room when Mosley complained to Lieutenant Childress. (Doc. 58-18, p. 19). Chief Baxton responded to Mosley by stating that he would speak to Young. No changes occurred, and Mosley observed additional pornographic books lying around the jail office. Young also put up a new calendar that displayed photographs of nude women. Later in 2009 Mosley again complained to Chief Baxton and to Jamie Morrison, an employee in the City personnel department. (Doc. 58-18, p. 20). During this time Mosley also

spoke to her union representative Pat Nichols. (Doc. 58-18, p. 25). Despite contacting those individuals, Mosley's problems with Young persisted.

Mosley's continued to experience workplace difficulties through 2010 when preferred furlough dates were given to a less senior employee (coworker Byron Holton)[1] and her vacation request paperwork went missing. (Doc. 58-18, p. 24-25). In February of 2010 Mosley discussed her difficulties involving Young with Captain Bobby Cole. (Doc. 58-18, p. 28). Mosley also discussed the vacation issues with Jamie Morrison. (Doc. 58-18, p. 26).

Due to City funding issues, Mosley was laid off of work from January 1, 2011 to May 5, 2011. (Doc. 58-18, p. 33). Shortly before returning back to work, Mosley spoke to East St. Louis Mayor Alvin Parks about the problems she was experiencing at the jail. (Doc. 58-18, p. 33). In response, Mayor Parks arranged for a meeting between Mosley and Deletra Hudson, the East. St. Louis City Manager. (Doc. 58-18, p. 34). Mosley told Hudson that she was stressed out and that she wanted someone assist her by resolving the situation at the jail. (Doc. 58-18, p. 36). Mosley also took photographs the offending items (the magazines and painting) and showed the photographs to Hudson. *Id.* On April 15, 2011 Mosley received a letter from Hudson stating that the City was in the process of bringing in an investigator to review Mosley's claims. *Id.*

When Mosley returned to work on May 5, 2011 the calendar and pornographic materials in the desk were gone (aside from a few torn out pages that remained in the desk) but the Alicia Keys painting remained on the wall. (Doc. 58-18, p. 37). Frustrated that the items had not been removed (and the calendar was in fact placed *back* on the wall on May 6), on May 9, 2011 Mosley contacted City Manager Deletra Hudson, Monica Grandberry with Human Resources, Chief of Police Lenzie Stewart and Mayor Parks to come down to the jail and view the materials. *Id.* Mosley then showed Hudson, Grandberry, Stewart and Parks the calendar and Alicia Keys

---

[1] Byron Holton was hired exactly 2 hours after Mosley. (Doc. 58-18, p. 25).

4

painting. (Doc. 58-18, p. 37). The calendar and painting were removed shortly thereafter. (Doc. 58-18, p. 40). The last few torn out pornographic pages were removed from the desk by May 31, 2011 and Mosley did not observe any additional sexually offensive images in the workplace after that date. (Doc. 58-18, p. 40).

Although the sexually offensive materials were removed, Mosley continued to experience difficulties at the Jail. In May of 2011 Mosley requested to take several vacation days that month. (Doc. 58-18, p. 40). The vacation days were denied by Captain Bobby Cole. *Id.* However, Mosley later requested vacation days for June, 2011 and the request was granted by Assistant Chief Keller. *Id.*

Mosley's next workplace dispute occurred on June 6, 2011. In the Jail there is a shared cabinet that is used by the Jail employees to hold miscellaneous items such as snacks and (non-pornographic) magazines. (Doc. 58-18, p. 42). Mosley worked the 11:00 PM to 7:00 AM, June 6, 2011 shift without incident and Young worked the 7:00 AM to 3:00 PM shift. *Id.* Mosley then returned to the jail that afternoon to work the 3:00 PM to 11:00 PM shift. *Id.* Upon returning to work, she noticed that someone had placed two voodoo dolls in the snacks cabinet. *Id.* Young later admitted to Mosley that he had placed the voodoo dolls in the cabinet. *Id.* Mosley testified at her deposition that Young placed the voodoo dolls in the cabinet as a retaliatory threat against her. *Id.* Just four days prior, on June 2, 2011, Mosley had spoken to investigator Thomas Berry regarding her sexual harassment claims. *Id.* Mosley later gave the voodoo dolls to her son. (Doc. 58-18, p. 51).

From June 6, 2011 to July 28, 2011 Mosley took off work due to medical issues. (Doc. 58-18, p. 42). On June 20, 2011 a meeting was held with Mosley, the Teamsters Union and investigator Thomas Berry to discuss the situation in the Jail. (Doc. 58-18, p. 44). Mosley later

5

filed an EEOC complaint against the Teamsters, but she declined to file a lawsuit against the union. *Id.* Later on June 20, 2011 Young drove by Mosley's house in a City vehicle. *Id.* Mosley was out on her porch at the time, and as Young drove by he made threatening hand gestures in her direction. *Id.*

Mosley returned to work on July 28, 2011. (Doc. 58-18, p. 48). Upon returning to work Lieutenant Mueller and Lieutenant Watson immediately confronted Mosley. *Id.* The two asked her to provide her sick leave medical documentation. Mosley testified at her deposition that she had not been asked for medical records after prior medical leave days and that request was actually in retaliation for her prior complaints. *Id.*

On December 6, 2011 Jamie Morrison in Human Resources filed a complaint against Mosley. (Doc. 58-18, p. 50). On several occasions Mosley had gone into the Human Resources office and discussed her retaliation and sexual harassment complaints with Morrison. *Id.* Morrison was upset that Mosley was using the Human Resources office as a "filtering ground" to air her grievances, and so Morrison filed the complaint against her. *Id.* Lieutenant Mueller later directed Mosley not to discuss her complaints with Morrison. *Id.*

In 2012 East St. Louis hired another female jailer named Andrea Jones. (Doc. 58-18, p. 52). Despite having less seniority than Mosley, Young gave Jones preferred shift assignments. *Id.* Jones was also allowed multiple shift changes that Mosley was not given. *Id.* Jones was fired after several months. (Doc. 58-18, p. 54). Also in 2012, Mosley filed a complaint with the union in regards to a dispute with coworkers Jamie Morrison and Ricky Perry. In December of 2012 Mosley was denied requested vacation days but Brandon Diehl, a co-worker with less seniority, was allowed similar vacation days. (Doc. 58-18, p. 55).

In April, 2013 Young brought a female acquaintance with him to work. (Doc. 58-18, p. 55). The woman was not an employee of the East St. Louis Police Department but Young allowed her to use the jail work computer. (Doc. 58-18, p. 56). Upon leaving, she left a scantily clad photograph of herself on the computer. *Id.* Mosley asked Young to delete the photo and Young told Mosley to remove it herself. *Id.* Additionally, in May 2013 Mosley was denied overtime pay. (Doc. 58-18, p. 57). After filing a grievance with the union Mosley later received the overtime pay. *Id.*

Mosley's last day of work at the jail was May 15, 2013. On that date the City of East St. Louis brought in an outside drug testing company to test approximately 100 City employees. (Deposition of Tenyia Cooper, Doc. 51-5, p. 3). Mosley was one of the employees tested and her urine sample tested positive for marijuana. (Doc. 58-18, p. 58). Mosley testified at her deposition that she does not use marijuana and that her urine sample appeared to be mishandled by the testing analyst. *Id.* Mosley testified that her unsealed sample was handled outside of her presence and poured into a second cup. *Id.* Mosley was later terminated from her position as a jailer. Despite the termination, an Illinois Department of Employment Security Administrative Law Judge later held that Mosley was entitled to unemployment benefits because there was a lack of evidence that Mosley engaged in any misconduct. (Doc. 58-2).

In another odd wrinkle to the drug test issue, the defendants sought leave of court to re-depose Curt Troutman and Teynia Cooper. (Doc. 65). According to the defendants' motion, these two individuals provided erroneous testimony at their first depositions regarding Mosley's May 15, 2013 drug test. In their first depositions Troutman and Cooper described Mosley as behaving erratically on May 15, 2013. However sometime later, the two realized that they had confused Mosley with another East St. Louis City employee. *Id.*

Mosley initially filed this lawsuit *pro se* on August 20, 2012. (Doc. 1). Mosley obtained private counsel several months later and she now proceeds on her third amended complaint. (Doc. 41). The defendants now move for summary judgment. (Doc. 51).

## II.     ANALYSIS

Summary judgment will be granted if the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a). The facts and all reasonable inferences are drawn in favor of the nonmoving party. *Kasten v. Saint-Gobain Performance Plastics Corp.*, 703 F.3d 966, 972 (7th Cir. 2012). A genuine dispute as to a material fact exists if "a fair-minded jury could return a verdict for the [non-moving party] on the evidence presented." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). When presented with a motion for summary judgment, "the court has one task and one task only: to decide, based on the evidence of record, whether there is any material dispute of fact that requires a trial." *Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 920 (7th Cir.1994). The defendants now seek summary judgment and each of the defendants' arguments will be addressed in turn.

The City first asserts that much of Mosley's allegations should be barred by the doctrine of laches. In Illinois, discrimination claims must be filed with the Equal Employment Opportunity Commission within 300 days of the discriminatory act. 42 U.S.C. § 2000e–5(e)(1); See also *Hall v. Bodine Elec. Co.*, 276 F.3d 345, 352–53 (7th Cir.2002) (overruled on other grounds). However, the Supreme Court has held that actions occurring prior to the 300 day limit may be considered when evaluating a hostile work environment claim, "[p]rovided that an act contributing to the claim occurs within the [statutory] filing period." *Nat'l R.R. Passenger Corp.*

*v. Morgan*, 536 U.S. 101, 117 (2002). Although these older acts may be considered, the Supreme Court also noted in *Morgan* that "an employer may raise a laches defense" and seek to exclude older events. *Id.* at 121. Laches is an equitable defense "which bars a plaintiff from maintaining a suit if he unreasonably delays in filing a suit and as a result harms the defendant." *Id.* at 121. To successfully raise the laches defense a party must demonstrate "(1) lack of diligence by the party against whom the defense is asserted, and (2) prejudice to the party asserting the defense." *Pruitt v. City of Chicago, Illinois*, 472 F.3d 925, 927 (7th Cir. 2006) (quoting *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 121 (2002)).

In the present case, the City raises the laches defense and asserts that any acts that occurred before 300 days prior to the filing of Mosley's EEOC complaint should be barred from consideration. Mosley filed her EEOC complaint on September 23, 2011. *Ergo*, the defendants argue Mosley should be prohibited from including events that occurred prior to November 28, 2010 in support of her claim. To succeed on the laches defense in this case, the City must demonstrate that Mosley unreasonably delayed in filing suit and that the defendants were prejudiced by the delay.

As for the "unreasonable delay" component, the City argues that Mosley first noticed the offensive materials during her first day at work on December 17, 2007. Mosley waited almost four years, until September 23, 2011, to file an EEOC complaint. The defendants assert that they are prejudiced by the delay because coworker Alicia Bruce is now deceased, coworkers Julius Young and Chaya Fleming are now retired and memories of the events have faded with time.

Although Mosley's delay is arguably unreasonable, any prejudice caused by the delay is minimal at best. If this Court accepts the City's laches defense, the events that occurred prior to November 28, 2010 would be "carved out" of her hostile work environment sexual harassment

9

claim. However the testimony of Bruce, Young and Fleming would still be relevant to events that occurred after that date. Additionally, the defendants have not identified any individuals that they are unable to contact (except for Bruce), nor have the defendants identified any specific relevant documents that have gone missing or destroyed due to the delay. Although the fading of memories is a legitimate issue, the defendants' concerns are primarily speculative, or problems that they would face regardless of whether the laches defense was granted. The defense is therefore denied.

The City next asserts that Mosley's "hostile work environment claim lacks merit because none of the conduct was directed at her because of her sex." To establish a prima facie case of Title VII hostile work environment sexual harassment Mosley must show that

> "(1) she was subjected to unwelcome sexual harassment in the form of sexual advances, requests for sexual favors or other verbal or physical conduct of a sexual nature; (2) the harassment was based on sex; (3) the sexual harassment had the effect of unreasonably interfering with the plaintiff's work performance in creating an intimidating, hostile or offensive working environment that affected seriously the psychological well-being of the plaintiff; and (4) there is a basis for employer liability."

*Valentine v. City of Chicago*, 452 F.3d 670, 677 (7th Cir. 2006) (quoting *Parkins v. Civil Constructors of Ill., Inc.*, 163 F.3d 1027, 1032 (7th Cir.1998)). The City argues that none of the conduct was directed at her specifically because the sexual imagery (pornographic books and magazines along with the painting and calendar) were located in the jail prior to Mosley's employment there. Further, the City argues that the placement of the voodoo dolls does not constitute sexual harassment.

Although the sexual imagery was located in the jail prior to Mosley's employment, under these circumstances a trier of fact could reasonably find that Young's actions were "motivated by general hostility to the presence of women in the workplace." *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 80 (1998). Mosley repeatedly asked Young to remove the sexual imagery but he denied Mosley's requests. Young's decision to keep the offending items around the workplace after Mosley (the only female employee in the jail) requested their removal may reasonably be considered discriminatory. Because the office was shared amongst the employees, Mosley was forced to observe the offending images. Asserting that "this is the way it's always been done" is an insufficient defense under these circumstances. Additionally, Young repeatedly called Mosley a "bitch." The Seventh Circuit held in *Passananti v. Cook County* that the word "bitch" is "gender-specific, and it can reasonably be considered evidence of sexual harassment." 689 F.3d 655, 666 (7th Cir. 2012). The Court went on to "reject the idea that a female plaintiff who has been subjected to repeated and hostile use of the word "bitch" must produce evidence beyond the word itself to allow a jury to infer that its use was derogatory towards women." *Id.* As such, Mosley has presented sufficient evidence that the harassment was based on sex to survive summary judgment.

The City also asserts that much of Mosley's claims should be barred pursuant to the *Ellerth / Faragher* defense. "Employers are not automatically liable for an environment of sexual harassment created by supervisors or co-workers." *Perry v. Harris Chernin, Inc.*, 126 F.3d 1010, 1013 (7th Cir. 1997). There are separate standards of employer Title VII liability depending on whether the individual engaging in the harassing conduct is the plaintiff's supervisor or merely a coworker. As for coworkers, "an employer may be liable if the harassment is done by a co-worker and the employer is shown to have been negligent in failing to prevent the harassment."

*Cooper-Schut v. Visteon Auto. Sys.*, 361 F.3d 421, 426 (7th Cir. 2004). "An employer is deemed negligent if it fails to take reasonable steps to discover and remedy harassment." *Id.*

Employers are, however, vicariously liable for sexual harassment conducted by a supervisor *unless* the plaintiff suffered no tangible employment action. *Cerros v. Steel Techs., Inc.*, 398 F.3d 944, 951 (7th Cir. 2005). If the supervisor engaged in harassing conduct and the plaintiff was not subject to a tangible employment action, the employer can assert the *Ellerth / Faragher* defense and avoid liability by demonstrating:

> a) that the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise.

*Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 765 (1998); see also *Faragher v. City of Boca Raton*, 524 U.S. 775 (1998).

In this case, on March 24, 2008 Mosley filed a complaint regarding Young's conduct towards her and the pornographic materials, thereby alerting her employer to the hostile work environment. (Grandberry Exhibit #2, Doc. 58-5). Mosley's March 24, 2008 complaint may not have specifically complied with the City's sexual harassment policy, but the Seventh Circuit has directed courts to avoid adopting a hyper technical approach to the second element of the *Ellerth/Faragher* defense. *Cerros v. Steel Techs., Inc.*, 398 F.3d 944, 952 (7th Cir. 2005). "The relevant inquiry is therefore whether the employee adequately alerted her employer to the harassment, thereby satisfying her obligation to avoid the harm, not whether she followed the letter of the reporting procedures set out in the employer's harassment policy." Here, Mosley

repeatedly alerted her employer to the harassment. The City's assertion of the defense therefore fails.

Furthermore, the City argues that Mosley's retaliation claim must fail because Mosley has not established a causal link between her complaints of sexual harassment and employment termination. Although the Court agrees that the causal link is nebulous, out of an abundance of caution, Mosley will be allowed to proceed on the retaliation wrongful termination claim. The fact that Mosley's urine specimen was handled outside her presence and poured into a separate cup raises the possibility of City wrong doing. Additionally, the defendants sought to re-depose Curt Troutman and Teynia Cooper after it was learned that the two provided erroneous testimony at their first depositions. Mosley shall proceed on her retaliation claim and the City may later seek relief under Rule 50(a) if appropriate.

Finally, the defendants argue that they are entitled to summary judgment on Mosley's pendent state law claim for intentional infliction of emotional distress ("IIED"). When state law provides the rule of decision the presiding federal court must "apply the law of the state as it believes the highest court of the state would apply it if the issue were presently before that tribunal." *State Farm Mut. Auto. Ins. Co. v. Pate*, 275 F.3d 666, 669 (7th Cir. 2001) (citing *Erie Railroad v. Tompkins*, 304 U.S. 64 (1938)). The parties do not dispute that Illinois law applies to this claim.

The Illinois Supreme Court first recognized IIED as a valid cause of action in *Knierim v. Izzo*, 22 Ill. 2d 73, 87, 174 N.E.2d 157, 165 (1961). The Illinois Supreme Court later adopted the Restatement (Second) of Torts § 46 (1965) requirements for establishing an IIED claim. *Pub. Fin. Corp. v. Davis*, 66 Ill. 2d 85, 89, 360 N.E.2d 765, 767 (1976). The Restatement provides that:

>One who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another is subject to liability for such emotional distress, and if bodily harm to the other results from it, for such bodily harm.

Restatement (Second) of Torts § 46 (1965). However "[t]he liability clearly does not extend to mere insults, indignities, threats, annoyances, petty oppressions or trivialities." *Pub. Fin. Corp. v. Davis*, 66 Ill. 2d at 89-90, 360 N.E.2d at 767. "Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency." *Id.* (quoting Restatement (Second) of Torts § 46 Comment D (1965)). Additionally, "[t]he emotional distress must be *severe*." *Id.* (emphasis in original). "The law intervenes only where the distress inflicted is so severe that no reasonable [person] could be expected to endure it." *Id*. (quoting Restatement (Second) of Torts § 46 Comment J (1965)).

In the present case, Young repeatedly called Mosley a "bitch," placed a voodoo doll in her desk, threatened to have her fired, denied her requests to remove the sexually offensive materials and made a threatening gesture as he drove by her house. Although Mosley has provided sufficient evidence that she suffered from severe emotional distress as a result of Young's actions, *See* Doc. 58-1, Report of Dr. Liss, Young's conduct does not rise to the level of "extreme and outrageous." Additionally, the plaintiff has not provided any analogous cases that would support an IIED claim under similar circumstances, and the factual background to the cases the plaintiff does provide are much more extreme than that experienced by Mosley. *Honaker v. Smith*, 256 F.3d 477 (7th Cir. 2001) (homeowner stated IIIED claim against mayor where mayor allegedly burned down plaintiff's house); *Pavlik v. Kornhaber*, 326 Ill. App. 3d 731, 736, 761 N.E.2d 175, 180 (2001) (employee stated IIED claim against supervisor where supervisor made repeated sexual advances, requested to meet after work hours, unwanted

14

touching and had offered promotions and benefits in exchange for sexual services); *Pavilon v. Kaferly*, 204 Ill. App. 3d 235, 242, 561 N.E.2d 1245, 1249 (1990) (sufficient evidence for jury to find in favor of employee's IIED claim against supervisor where supervisor threatened to rape and kill employee, propositioned employee for sex, sent harassing letters to employee's parents, and threatened to file a lawsuit challenging the custody rights of employee's only child).

Because no reasonable jury could find in favor of Mosley on her IIED claim, the Court need not address whether the IIED claim against the City is preempted by the Illinois Workers Compensation Act, 820 ILCS 305/5(a). *See McPherson v. City of Waukegan,* 379 F.3d 430, 443 (7th Cir. 2004).

### III. CONCLUSION

The defendants' Motion for Summary Judgment is GRANTED as to Mosley's intentional infliction of emotional distress claim (Count II) against defendants City of East St. Louis and Julius Young. The defendants' motion is DENIED for Mosley's other two claims.

SO ORDERED.

DATED:   December 21, 2015 .

*s/Philip M. Frazier*
**PHILIP M. FRAZIER**
**UNITED STATES MAGISTRATE JUDGE**
